JUDGE CARTER

# 21 MISC 787

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
SECURITIES AND EXCHANGE COMMISSION,      :
                                          :
                          Applicant,      :      No.
          - against -                     :
                                          :      ECF CASE
GERALD FAUTH,                             :
                                          :
                          Respondent.     :
------------------------------------------------------------------ x

## DECLARATION OF NANCY A. BROWN

I, Nancy A. Brown, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a member of the bar of the State of New York and of the bar of this Court. I am employed as Senior Trial Counsel in the Division of Enforcement at the New York Regional Office of Plaintiff Securities and Exchange Commission ("Commission"). I submit this Declaration in Support of (1) the Commission's Application for an Order to Show Cause and for an Order Requiring Gerald Fauth to Comply with Subpoena ("Application"); and (2) the Commission's Motion for an Order Permitting it to Redact Respondent's Medical Information from its Filings ("Motion to Redact").

2.      The Commission has made no previous application for similar relief.

3.      I make this Declaration based upon personal knowledge, information and belief. The sources of my information and the bases of my belief include documents obtained by the staff of the Commission's Enforcement Division (the "Staff"), including but not limited to phone records and brokerage account records, as well as interviews conducted by the Staff. Because the Commission submits this Declaration for the limited purpose of supporting the Application and the Motion to Redact, I have not set forth each and every fact that I know about this matter.

4.      As detailed below, Respondent Gerald Fauth ("Fauth" or "Respondent") should

be ordered to comply with the investigative subpoena that the Commission lawfully issued and

served upon him through counsel on May 26, 2020 ("Subpoena").  Because the Application

requires the Court to consider details regarding Fauth's medical condition, the Commission

should be permitted to file its supporting papers that make reference to specifics about that

condition in redacted form, and to file unredacted versions of such supporting papers under seal.

Background of the Investigation

5.      On March 25, 2020, the Commission issued a nonpublic Order Directing Private

Investigation and Designating Officers to Take Testimony in the Investigation.  On June 16,

2021, the Commission issued a Supplemental Order Directing Private Investigation and

Designating Officers to Take Testimony (collectively with the March 25, 2020 Formal Order, the

"Formal Orders").  The Formal Orders designated certain individuals, including me, as officers

of the Commission empowered to administer oaths and affirmations, subpoena witnesses,

compel their attendance, take evidence, and require the production of any records deemed

relevant or material to the investigation.

6.      Pursuant to the Formal Orders, the Commission is investigating whether any

person or entities have engaged in acts constituting violations of various provisions of the federal

securities laws by, among other things, engaging in a scheme to defraud, in connection with the

trading of certain securities on the basis of material nonpublic information in breach of a

fiduciary or other duty arising out of a relationship of trust and confidence—i.e., insider trading.

7.      Among other things, the Commission is investigating whether Senator Richard

Burr ("Senator Burr") sold stocks on the basis of material nonpublic information on February 13,

2020, in violation of the federal securities laws, including the STOCK Act, a statute passed by

the U.S. Congress in 2012 to prohibit its members from using nonpublic information derived from their positions for their personal benefit.  The Commission is also investigating whether the Respondent and his wife, Mary Fauth, sold securities that same day on the basis of material nonpublic information supplied to them by Senator Burr in violation of his duties.

8.      Fauth has information relevant to the Commission's ongoing investigation. Fauth is the brother of Senator Burr's wife, Brooke Burr.  It appears, based on the Commission's investigation, that Senator Burr and Brooke Burr communicated regularly via phone with Respondent and Mary Fauth in February 2020, and Senator Burr stayed overnight with the Fauths at their home on more than one occasion in early February 2020.  On February 13, 2020, immediately after he spoke to Senator Burr on the phone—and immediately after Senator Burr had directed his own broker to liquidate his own joint IRA portfolio—Fauth appears to have directed the sales of several stocks in Mary Fauth's brokerage account.

9.      More specifically, the timing of certain relevant phone calls and events on February 13, 2020, was as follows, based on telephone records and other information available to the Staff:

- 8:54 a.m.[1] — Senator Burr placed a call from his cellphone to his broker's landline at Broker-Dealer 1 and directed his broker to sell $1,652,866 worth of stock — all but one of the equities in his and his wife's joint individual retirement account ("IRA") portfolio.[2]  The call lasted 12 minutes and 52 seconds.

- 11:07 a.m. — Fauth placed a call from his cellphone to his sister Brooke Burr's cellphone.  The call lasted 2 minutes and 36 seconds.

- 11:32 a.m. — Senator Burr placed a call from his cellphone to Fauth's cellphone. The call lasted 50 seconds.

---

[1]      All times are in Eastern Standard Time.

[2]      Broker-Dealer 1 is a broker-dealer registered with the Commission.

- 11:33 a.m. — Fauth placed a call from his cellphone to his primary broker's landline at Broker-Dealer 2 and was told by an employee who answered the call that his primary broker was out of the office.[3]  The call lasted 1 minute and 6 seconds.

- 11:35 a.m. — Fauth then placed a call from his cellphone to another broker's landline at Broker-Dealer 2 and directed her to sell several stocks in his wife's account.  The call lasted 24 minutes.

- 11:38 a.m. — Per Senator Burr's instructions, his broker at Broker-Dealer-1 entered trades to sell equities in the IRA accounts of both Senator Burr and his wife.

- 4:34 p.m. — After the market had closed that day, Senator Burr logged in to his online brokerage account using an IP address assigned to an account registered to Mary Fauth in her Alexandria, Virginia home.

10.   On February 13, 2020, it appears from the Commission's investigation that Senator Burr possessed material nonpublic information concerning Covid-19 and its potential impact on the U.S. and global economies, including but not limited to information he had learned through his position on the Senate Select Committee on Intelligence; his position on the Senate Health, Education, Labor and Pensions ("HELP") Committee; and his relationship with certain former staffers that were then directing key aspects of the US Government's preparedness and response to the Covid-19 pandemic.  The Commission is investigating, among other things, whether the trades Fauth placed in his wife Mary Fauth's account at Broker-Dealer 2 were made on the basis of material nonpublic information he learned from Senator Burr.

Respondent Ignores the Commission's Document Subpoena

11.   Beginning in April 2020, the Staff repeatedly attempted to reach Fauth through his counsel, Joseph Warin of Gibson, Dunn & Crutcher LLP ("Gibson Dunn").  The Staff had

---

[3]      Broker-Dealer 2 is a broker-dealer registered with the Commission.

learned that Mr. Warin and his firm were representing Fauth in a parallel investigation conducted by the Department of Justice ("DOJ"). Respondent's counsel returned none of the Staff's calls.

12.   On May 12, 2020, given Respondent's counsel's apparent refusal to communicate with the Staff, the Staff directed subpoenas for documents to both Fauth and his wife at their home by overnight mail.

13.   At 5:40 p.m. on May 20, 2020—the date by which Fauth's production was due pursuant to the May 12, 2020 document subpoena—the Staff called Respondent's home phone and left a voicemail, noting that the Staff had received no response from either Fauth or his wife to the document subpoenas. The Staff sent a follow-up email to Fauth at approximately 6:30 p.m., notifying him that he had not complied with the document subpoena. In its email, the Staff requested that Respondent contact the Staff, or, if he were represented, that he have counsel contact the Staff.

14.   Minutes later, at 6:39 p.m., Edward Patterson, another attorney at Gibson Dunn, and Mr. Warin emailed the Staff and, for the first time, notified the Staff that their firm was indeed representing both Respondent and his wife in the Commission's investigation and offered to make a production of documents on their behalf by the end of the week.

15.   In a subsequent telephone conversation on May 21, 2020, between the Staff and Messrs. Warin and Patterson, Mr. Warin objected to the Staff's communication with his clients and directed that all future communications about the Fauths be had with him or his colleagues at his firm.

The Commission's Unsuccessful Efforts to Obtain Fauth's Testimony

16.   On May 26, 2020, the Staff served the Subpoena for testimony on Fauth through his counsel by email. The Subpoena was issued by my colleague, Tejal D. Shah, who was

designated in the Formal Orders as an Officer of the Commission for the purposes of issuing subpoenas.  A true and correct copy of the Subpoena for Respondent's testimony is appended hereto as Exhibit A.

17.    Mr. Warin acknowledged receipt of the Subpoena fewer than 20 minutes later by email.  (A true and correct copy of Mr. Warin's May 26, 2020 email to the Staff is appended hereto as Exhibit B.)  In later telephone conversations, counsel maintained that Fauth could not sit for testimony at the present time, citing his health concerns, and offered to make an attorney proffer to the Staff.  The Staff accepted Mr. Warin's offer of an attorney proffer but noted that the Staff was not agreeing to forgo taking the testimony of either of the Fauths.

18.    On June 18, 2020, Respondent's counsel made a presentation to the Staff, including on the status of Respondent's various health concerns that, in counsel's view, made Fauth's ability to sit for testimony untenable.

19.    On June 25, 2020, the Staff spoke to Respondent's counsel via telephone and sought a date for Fauth's testimony.  Respondent's counsel stated he would revert with potential dates.  On September 15, 2020, the Staff spoke to Respondent's counsel via telephone again. Respondent's counsel said he would speak to Fauth regarding the status of his health issues.

20.    Thereafter, on November 17, 2020, in response to an inquiry from a DOJ prosecutor conducting the parallel criminal investigation, Respondent's counsel again maintained that Fauth's serious health issues precluded him from sitting for testimony.

21.    In mid-March 2021, Ms. Shah reached out again to Respondent's counsel, seeking a date for Respondent's testimony by video conference, and requesting a letter from one of his attending physicians regarding his medical condition, if it was still Fauth's position that his physical condition rendered him unavailable for testimony.  Respondent's counsel responded on

March 26, 2021, with a detailed list of the ███████████████████████████ ████████████████████████████████████ that precluded Fauth from sitting for even a limited remote testimony session, but he included no documentation from any of Respondent's doctors.

22.   Ms. Shah followed up on March 26, 2021, with another request for medical documentation of Fauth's condition.  In the alternative, Ms. Shah sought permission for the Staff to reach out to Respondent's doctors for confirmation.  Respondent's counsel responded by email that same day that he would obtain a letter from one or more of Fauth's doctors.  A true and correct copy of the March 26, 2021 email exchange between Ms. Shah and Mr. Warin is appended hereto as Exhibit C.

23.   When Respondent's counsel failed to supply the doctor's letter he had agreed to obtain describing Fauth's medical condition, Ms. Shah contacted Respondent's counsel again on April 6, 2021, seeking medical documentation of Fauth's inability to sit for even a limited session of testimony, and, hearing nothing, again on April 30, 2021, and May 6, 2021.

24.   On May 12, 2021, Respondent's counsel finally responded, but included no doctor's explanation of how Fauth's medical condition made a limited testimony session impossible.  Instead, counsel again identified ███████████████ that he maintained made testimony from Respondent impossible in the immediate future.  Respondent's counsel again promised to provide a letter from one of Respondent's doctors, but only after a "comprehensive medical evaluation" then scheduled for June 17, 2021.  A true and correct copy of counsel's May 12, 2021 letter is appended hereto as Exhibit D.

25.   In early May 2021, the Staff confirmed that, despite Fauth's medical issues, he was continuing his full-time employment as one of three members of the National Mediation

Board ("NMB").  When Ms. Shah emailed Respondent's counsel to obtain an explanation of

how Respondent was able to perform his duties at the NMB while unable to sit for a limited

session of no more than three hours of remote testimony, counsel responded by letter, dated May

17, 2021, noting that there is a difference between a "routine workday and the incredibly

stressful environment of providing recorded testimony to a team of government attorneys."  In

that letter, counsel also represented that counsel would be prepared to discuss "the possibility

that [Respondent] provide testimony" after Fauth had "completed ███████████"  A true and

correct copy of counsel's May 17, 2021 letter is appended hereto as <u>Exhibit E</u>.

26.    In a follow-up call with Messrs. Warin, Patterson, and their colleague Brian

Williamson on May 19, 2021, Ms. Shah and I asked about Fauth's ability to continue with his

NMB responsibilities despite ████████████████ his medical condition.  Counsel

responded that Fauth participated in NMB activities only by phone and limited his participation

only to "crisis issues."

27.    Gibson Dunn ultimately provided a letter from Respondent's primary care

physician on May 28, 2021.  A true and correct copy of the May 28, 2021 letter (and the

accompanying letter from Respondent's doctor, dated May 25, 2021), are appended hereto as

<u>Exhibit F</u>.

28.    Because the May 25, 2021 doctor's letter indicated that Fauth was improving and

that further evaluations would be performed on June 17, 2021, I asked Gibson Dunn for an

update on June 21, 2021.  A true and correct copy of my June 21, 2021 email to Gibson Dunn is

appended hereto as <u>Exhibit G</u>.

29.    By letter dated June 29, 2021, Gibson Dunn responded that Respondent was still

undergoing ██████████ through the end of July and would postpone his medical evaluations

until then.  A true and correct copy of counsel's June 29, 2021 letter is appended hereto as

Exhibit H.

30.    On August 9 and (having received no response) again on August 27, 2021, I

emailed Gibson Dunn to request an update on Fauth's condition, particularly in light of counsel's

June 29, 2021 representations (Ex. H) that Respondent would undergo comprehensive medical

evaluations at the end of July, and his May 17, 2021 representation (Ex. E) that counsel would be

prepared to discuss dates for Respondent's testimony once Respondent's ███████ had

concluded.  Counsel responded to those emails on August 17, 2021, noting that Respondent's

███████ had indeed concluded, and that the evaluations would now take place

███████ scheduled through the end of the month of August.  Counsel

promised to "update the Staff when additional relevant information becomes available."  (A true

and correct copy of counsel's August 17, 2021 letter is appended hereto as Exhibit I.)

31.    On September 17, 2021, I emailed counsel to obtain the promised updates.  When

no updates were provided, I wrote to counsel at 9:09 a.m. on September 30, 2021, formally

seeking the update on Fauth's health.  I further sought a description of Fauth's daily duties in

performing his role at the NMB, including the specific responsibilities he carries out in his

recently assumed role as Chair and any accommodations he had sought and obtained from the

NMB that allowed him to maintain his position while he dealt with his medical issues.  (A true

and correct copy of my September 30, 2021 letter to counsel is appended hereto as Exhibit J.)

32.    At 10:38 a.m. on September 30, 2021, I received a letter from Respondent's

counsel, dated the day before, September 29, 2021, that ignored my letter of earlier that morning,

and specifically my requests for information regarding Respondent's daily work routine.

33.   In counsel's September 29, 2021 letter (a true and correct copy of which is appended hereto as Exhibit K), he reported that ███████████ from which Fauth had been suffering ███████ but noted that Fauth's ███████████ Counsel represented that he would provide an update to us after Fauth had another medical evaluation on October 28, 2021.

34.   After receiving counsel's September 29, 2021 letter on September 30, I emailed Respondent's counsel to request again the information regarding Fauth's daily activities at the NMB. I emailed counsel again on October 7, 2021, and reiterated our offer to discuss the accommodations that Fauth might need in order to sit for a limited testimony session. (A true and correct copy of my emails dated September 30 and October 7, 2021 are appended hereto as Exhibit L.)

35.   Respondent's counsel ultimately responded by email dated October 18, 2021. In that email, counsel provided none of the information I had requested about Fauth's duties, responsibilities, and daily work schedule. But, in that email, counsel offered for the first time to discuss—at some unspecified future time—the accommodations for a testimony session Fauth would need. In an email responding that same day, I asked counsel to provide by Wednesday October 20, 2021 a date for Fauth's testimony prior to November 2, and the list of accommodations he and counsel sought.

36.   Late in the evening of October 19, 2021, Fauth's counsel responded. In their letter, counsel offered neither a testimony date nor a list of needed accommodations. Instead, counsel maintained that any such discussion should await the results of Fauth's October 28, 2021 evaluation by his ███████, and proposed a phone call for November 2, 2021. (A true and correct copy of counsel's October 19, 2021 letter is appended hereto as Exhibit M.)

37.   Given counsel's identification of the specialist performing the evaluation and counsel's description of its nature and purpose (Ex. M), it appears that the scheduled October 28, 2021 evaluation is the same evaluation first referred to by counsel in his May 17, 2021 letter (Ex. D) that was scheduled for June 17, 2021, and then apparently postponed throughout the summer. (Exs. H and I.)

38.   To date, Fauth has not appeared or agreed to appear for testimony pursuant to the Subpoena.

<u>The NMB and Fauth's Continuing Work as Its Chair</u>

39.   Throughout the nearly year and a half that Respondent has been ███████████, he has been one of three full-time and salaried members of the NMB.  (A true and correct copy of the organization chart for the NMB is appended hereto as <u>Exhibit N</u> and is available at <u>https://nmb.gov/NMB_Application/index.php/nmb-organization-chart/</u>.)

40.   According to its Fiscal Year 2021 Congressional Budget Submission, dated February 10, 2020, available at <u>https://nmb.gov/NMB_Application/wp-content/uploads/2020/02/National-Mediation-Board-FY-2021-CJ.pdf</u>, (the "Budget Submission"), the NMB is an independent Executive Branch agency established by the Railway Labor Act of 1926, as amended in 1934 (the "Act").  (<u>Id.</u> at 4.)  The NMB's mission is to "deliver critical services to approximately 150 commercial airlines and over 500 railroads and their unions."  (<u>Id.</u> at 2.)

> The NMB performs a key role in achieving the principal purpose of the Act: "to avoid any interruption in commerce or to the operation of any carrier engaged therein" by assisting the carriers and their employees in their duty under the Act to "exert every reasonable effort" to settle disputes.

(<u>Id.</u> at 4.)

41.   The NMB Mission Statement from its Budget Submission identifies

three statutory goals:

1. To facilitate the resolution of disputes in the negotiation of new or revised collective bargaining agreements;

2. To insure employee rights of self-organization, without interference, when representation disputes exist, and;

3. To provide for the prompt and orderly settlement of disputes growing out of minor disputes or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

(Budget Submission at 4.)  NMB describes its "Agency Goals" as including:

• To promote the amicable resolution of disputes between carriers and employees by providing quality conflict prevention and resolution services, including both traditional mediation and alternative dispute resolution, while encouraging an atmosphere of harmony that will facilitate future bargaining in the airline and railroad industries.

• To deliver, through the prompt investigation of representation disputes among rail and air employees definitive resolution of employees' representation status for collective bargaining purposes.

• To improve and strengthen the NMB's systems and processes for resolving minor disputes in the air and rail industries.

(Id. at 4.)

42.   The three NMB members

administer the Railway Labor Act, which governs labor relations in the rail and air industries.  The Board Members oversee the mediation of collective bargaining disputes, and by quorum they are responsible for determining whether and when to release the parties so they may engage in self-help. . . . Additionally, the Members are responsible for certifying the results of representation elections, and for all representation policy decisions, including, but not limited to, jurisdiction, merger issues, system and craft or class issues, and election interference.  The Board Members also oversee the funding of arbitration of disputes over the interpretation of collective bargaining agreements in the rail industry.

(Budget Submission at 15.)

43.   As one of its functions, the NMB adjudicates representational issues regarding the rights of employees in the airline and railroad industries to "select a labor organization or individual to represent them for collective bargaining." (Budget Submission at 27.) "In many instances, labor and management raise substantial issues relating to the composition of the electorate, jurisdictional challenges, allegations of election interference, and other complex matters which require careful investigations and ruling by the NMB." (Id.)

44.   In fiscal year 2021, the Board resolved nearly twenty petitions for or challenges to representational certification, sometimes issuing multipage decisions that analyze the record and make determinations based on the Board's application of the governing statue to the record facts. (A true and correct copy of the list of 2021 Determinations issued by the NMB is appended hereto as Exhibit O and is available at https://nmb.gov/NMB_Application/index.php/agency-determinations/2021-determinations/. Copies of the determinations themselves are hyperlinked at that web address.) Each of these decisions is issued by the Board and none contains any reference to Fauth's recusal or absence from the process by which those decisions were issued. The most recent decision is dated September 29, 2021. (See Ex. O.)

45.   Unable to obtain any information from Respondent's counsel regarding Fauth's daily responsibilities at the NMB, the Staff issued a document subpoena to the NMB on October 8, 2021, seeking limited information regarding Fauth's participation in the Board's work.

46.   Pursuant to that subpoena, on October 13, 2021, the NMB produced records reflecting Fauth's regular participation in the last few months in each of NMB's regular staff meetings and Department Directors' meetings, as well as Executive Session meetings held among the three Members of the Board. (See Exhibit P (Letter, dated October 13, 2021, from Maria-Kate Dowling, Acting General Counsel of the NMB, at 1-2).)

47.   On July 1, 2021, Respondent assumed the additional duties of Chair of the NMB. (A true and correct copy of the NMB's press release announcing the appointment is appended hereto as Exhibit Q.)

48.   On July 2, 2021, President Biden announced his decision to nominate Fauth to serve as an NMB member for an additional three-year term.  (A true and correct copy of the White House press release announcing Fauth's re-nomination is appended hereto as Exhibit R.)

49.   Records produced by the NMB confirm that on September 14, 2021, in connection with his re-nomination to a new term as a Member of the NMB, Fauth met for an interview via video conference with members of the Minority Staff of the Senate HELP Committee.  (See Ex. P, at 1.)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 20, 2021.
New York, New York

Nancy A. Brown

14